**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHEL A. BARBER, | ) | CASE NO. 1:25-CV-02731-MJH |
| | ) | |
| Plaintiff, | ) | MICHAEL J. HENDERSHOT |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |

## I. INTRODUCTION

Plaintiff Rachel A. Barber ("Ms. Barber") seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2. (*See* ECF non-document entry dated December 16, 2025). For the reasons set forth below, I RECOMMEND that the Court REVERSE the Commissioner's decision and REMAND this matter to the Commissioner for further proceedings consistent with this report and recommendation.

## II. PROCEDURAL HISTORY

On October 16, 2023, Ms. Barber filed her application for SSI. (Tr. 199). Ms. Barber's application related to her migraines, anxiety with depression, panic attacks, skin lesions and rashes, primary osteoarthritis of both knees, numbness of the right foot, gallbladder disease, hyperlipidemia, chronic insomnia, and abnormal spinal MRI. (Tr. 222).

The Social Security Administration ("SSA") denied Ms. Barber's application initially and upon reconsideration. (Tr. 67, 79). Ms. Barber requested a hearing before an administrative law judge ("ALJ"). (Tr. 104). The ALJ held a hearing on December 16, 2024. (Tr. 34). Ms. Barber testified, as did an independent vocational expert ("VE"). On December 18, 2024, the ALJ issued a written decision finding that Ms. Barber is not disabled. (Tr. 7). The ALJ's decision became final on October 17, 2025, when the Appeals Council declined further review. (Tr. 1).

On December 16, 2025, Ms. Barber filed her Complaint, challenging the Commissioner's final decision that she was not disabled. (ECF No. 1). Ms. Barber asserts the following assignments of error:

(1) The ALJ erroneously classified Ms. Barber's migraines as a not severe [*sic*] at step two of the sequential evaluation process – resulting in an inaccurate residual functional capacity.

(2) The ALJ failed to adequately account for all of the limitations properly documented in the record.

(ECF No. 7, PageID # 767).

## III. BACKGROUND

### A. <u>Personal, Educational, and Vocational Experience</u>

Ms. Barber was born in 1980 and was 43 years old on the date of her application. (Tr. 199). She has a high school diploma. (Tr. 223). Ms. Barber has never married. (Tr. 200). She previously worked as a preschool teacher. (Tr. 223).

### B. <u>Relevant Hearing Testimony</u>

#### *1. Ms. Barber's Testimony*

Ms. Barber testified that she has difficulty walking and sitting because of swelling in her legs. (Tr. 43). She also testified that she has arthritis in one knee and needs a knee

replacement in the other, and that she needs to keep her legs elevated as a result. *Id*. Ms. Barber further testified that she elevates her legs above her waist for an average of four to five hours per day. (Tr. 47-48). She testified that the pain in her knees is constant and that she also receives shots in her back due to back pain, which radiates through her legs to her feet. (Tr. 48). Ms. Barber also testified that she experiences numbness in her feet, which makes it difficult for her to wear shoes and causes her to walk with a cane. *Id*. She testified that she can only walk 15 to 20 steps before she needs a break and that she can sit for 10 to 15 minutes before she needs to change positions. (Tr. 52).

Ms. Barber also testified that she gets migraines three to four times per month. (Tr. 49). She testified that her migraines typically last two to three days, and that she stays in her room when she gets one. *Id*. She also testified that her migraines give her problems with light, noise, sounds, and smells, and that she also experiences nausea. *Id*.

*2.* ***Vocational Expert's Testimony***

The ALJ asked the VE to consider a hypothetical individual with Ms. Barber's age, education, and prior work experience who was able to perform light work but could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally kneel or crawl; could never be exposed to hazards; and could handle only occasional changes in the work setting. (Tr. 44). The VE testified that the hypothetical individual could perform jobs existing in significant numbers in the national economy, including work as a routing clerk, cashier, or sales attendant. (Tr. 44-45).

In response to a question from Ms. Barber's counsel, the VE testified that it would be work preclusive if the hypothetical individual needed to elevate their legs for between four and five hours per day. (Tr. 52-53). The VE also testified that it would be work preclusive if

the individual required the use of a cane for standing or walking. (Tr. 54).

### C. Relevant Opinion Evidence[1]

#### *1. State Agency Medical Consultants*

On December 27, 2023, W. Scott Bolz, M.D., a state agency medical consultant, opined that Ms. Barber could never climb ladders, ropes, or scaffolds in light of her obesity, chronic low back pain, and osteoarthritis of her left knee, but that she did not otherwise have postural limitations. (Tr. 75). Dr. Bolz further opined that Ms. Barber should avoid all hazards, machinery, unprotected heights, and commercial driving. (Tr. 76). Dr. Bolz also noted that the medical evidence reflected that Ms. Barber had a diagnosis of migraines. (Tr. 74). On March 9, 2024, Elizabeth Das, M.D., partially concurred with Dr. Bolz's findings on reconsideration, but added additional postural limitations, opining that Ms. Barber could only occasionally climb ramps or stairs, kneel, or crawl. (Tr. 84-86).

The ALJ found that the opinions of the state agency medical consultants were persuasive, but that Dr. Das' additional postural limitations were more persuasive. (Tr. 19).

### D. Relevant Medical Evidence

Ms. Barber received injections for knee pain throughout the relevant period. On October 18, 2022, she received an injection in her right knee. (Tr. 409). It was noted that she was in no acute distress and that examination of her right knee showed no swelling, erythema, effusion, warmth, or deformity. (Tr. 409-10). She did not display any ligament laxity and had intact strength and sensation to light touch. (Tr. 410).

On November 11, 2022, Ms. Barber received another injection in her right knee to

---

[1] At the administrative level, Ms. Barber alleged both physical and mental impairments. In this proceeding, she challenges only the ALJ's determination with respect to her migraines and alleged need to elevate her legs. Accordingly, I summarize only evidence regarding those issues.

treat osteoarthritis of her right patellofemoral joint. (Tr. 397). On February 17, 2023, Ms. Barber received an injection in her left knee to treat osteoarthritis. (Tr. 372). Ms. Barber received another injection in her left knee on August 18, 2023. (Tr. 321). She also received bilateral knee injections on March 29, 2024 and June 25, 2024. (Tr. 645, 711). On July 22, 2024, Ms. Barber reported that a July 2, 2024 injection in her left knee had provided her with little benefit and that she was informed she would eventually need a knee replacement. (Tr. 692). Ms. Barber received another set of injections on October 1, 2024, and treatment notes indicate that she was to receive weekly injections. (Tr. 683).

On February 14, 2023, Ms. Barber saw her primary care provider for weight management. (Tr. 379). She reported that she was using an elliptical machine and a bicycle daily and that she was not having leg swelling. (Tr. 379-80).

On February 15, 2023, Ms. Barber had a follow-up visit with the Cleveland Clinic Neurologic Institute Headache and Facial Pain Section for further evaluation of her headaches. (Tr. 374). Aarushi Suneji, M.D. noted that Ms. Barber had a diagnosis of chronic migraine and that she had prescriptions for several medications. *Id*. Ms. Barber reported that she continued to have two or three headaches per month and inquired about rescue therapy. (Tr. 375). In a headache questionnaire that she completed prior to her visit, Ms. Barber stated that she experienced headaches with decreased productivity, light sensitivity, and nausea on five days in the past month. (Tr. 377). Dr. Suneja stated that Ms. Barber met AHS criteria for treatment of migraines with an oral small molecule CGRP antagonist because she had more than five headaches per month lasting for four or more hours per day and accompanied by photophobia, phonophobia, and nausea. *Id*. Dr. Suneja also stated that medication overuse headaches had been ruled out and that Ms. Barber had tried and failed anti-migraine

medications. *Id*. Dr. Suneja noted that Ms. Barber was stable and was doing well on her current regimen. (Tr. 376). She was started on Ubrelvy for acute rescue therapy. *Id*.

On July 28, 2023, Ms. Barber saw a podiatrist, complaining of pain and numbness in her left foot. (Tr. 338). She rated the pain as a seven out of ten and said that she used a pillow for comfort and support. *Id*. On examination, she had intact light touch sensation but decreased vibratory sensation. (Tr. 341). She was diagnosed with neuropathy, instructed on supportive shoes and orthotics, and referred to neurology. (Tr. 341).

On August 7, 2023, Ms. Barber had a virtual visit with her primary care provider. (Tr. 501). Her provider noted that Ms. Barber was taking Topamax for migraines. (Tr. 502). She denied leg swelling, but reported leg and foot discomfort at night. (Tr. 503).

Ms. Barber had a pain management appointment on August 10, 2023. (Tr. 324). She reported experiencing pain in her left leg for several months, which she rated as a seven out of ten. *Id*. She also reported back pain that radiated to her legs, as well as numbness in her feet. (Tr. 326). On examination, she displayed a normal gait, grossly normal motor strength, and no deformities, edema, or skin discoloration. (Tr. 327). She was encouraged to lose weight and instructed to take Topamax, which she had not been taking as prescribed. (Tr. 329).

On September 8, 2023, Ms. Barber presented to the Cleveland Clinic Neuromuscular Center for a virtual evaluation. (Tr. 315). She reported numbness in her feet and left leg. *Id*. On examination, she was able to move her legs symmetrically, and it was noted that the cause of her symptoms was difficult to determine based on the clinical description and a virtual visit. (Tr. 316).

Ms. Barber underwent an annual physical on October 19, 2023. (Tr. 477). She was

negative for arthralgias, gait problems, joint swelling, and myalgias. *Id*. Ms. Barber had another virtual visit with her primary care provider on January 12, 2024. (Tr. 575). She reported that she had been doing well since her prior visit. *Id*. She said that knee injections had given her good relief over the previous four months, but that the pain worsened with cold. *Id*.

On March 18, 2024, Ms. Barber had a follow-up visit regarding her chronic pain. (Tr. 639). She reported that knee injections had previously benefited her. (Tr. 641). She also reported ongoing back pain. *Id*. On examination, Ms. Barber displayed a limited range of motion in her back in all directions, valgus deformity of both knees, and an antalgic gait. (Tr. 642). At an April 12, 2024 weight management visit, Ms. Barber reported myalgias but denied leg swelling. (Tr. 633).

Ms. Barber went to the Cleveland Clinic Neuromuscular Center on May 17, 2024. (Tr. 716). She reported difficulty wearing shoes. *Id*. An examination showed decreased pinprick sensation in her left foot and proprioception that required full excursion of the left toe. (Tr. 717). Her treating physician noted that the examination was suggestive of possible lumbosacral spine causes. *Id*. It was noted that an EMG was largely unrevealing and that an MRI of her lumbosacral spine would be ordered. (Tr. 717-18).

On July 2, 2024, Ms. Barber had an x-ray of her left knee, which showed no acute findings and no progression of her moderate to marked left knee osteoarthritis. (Tr. 733). On July 5, 2024, Ms. Barber had an MRI of her lumbar spine. (Tr. 694).The MRI revealed moderate spinal canal stenosis at L2-3 and grade 1 anterolisthesis of L5 on S1 with moderate right-sided neural foraminal stenosis. *Id*. On July 22, 2024, it was noted that she may benefit from an epidural steroid injection to treat her back pain. (Tr. 695-96).

Ms. Barber had a follow-up visit with her primary care provider on July 11, 2024. (Tr. 703). Her provider recommended that she continue receiving knee injections and discussed the pros and cons of surgery. (Tr. 705). She was given a referral for physical therapy. *Id*. It was noted that she had discontinued gabapentin and began taking topiramate. *Id*.

Ms. Barber had a virtual visit with Dr. Suneja at the Cleveland Clinic Neurologic Institute on October 17, 2024. (Tr. 674). She reported that her symptoms were stable and that Ubrelvy was effective as a rescue medication, but that her insurance had stopped covering her Ajovy injections. *Id*. She also reported that she was having more than 15 migraines per month since she stopped receiving those injections. *Id*. Dr. Suneja again noted a diagnosis of chronic migraines and stated that next steps included Botox injections and Qulipta. (Tr. 676). Dr. Suneja further stated:

> We will request precertification for Calcitonin Gene Related Peptide Monoclonal Antibody, Fremanezumab. This patient meets ICHD-3 criteria for treatment with CGRP MAB, She has Chronic Migraine Headache (CM), Chronic Migraine without aura, without mention of intractable migraine without mention of status migrainosus which occurs at least 15 days per month for at least 4 hours per day. The FDA has approved CGRP MAB for prevention of migraine. Specifically, the patient has 15 migraines per month, lasting 4 or more hours/d associated with photophobia, phonophobia, nausea for three or more months. Medication overuse headache has been ruled out. Patient is currently taking a Gepant (Ubrelvy) for acute treatment of her migraine.

(Tr. 676). In addition, Dr. Suneja stated that Ms. Barber had tried several preventative medications for three or more months that did not provide benefits or that were discontinued due to side effects, including gabapentin, topiramate, Lexapro, propranolol, verapamil, rizatriptan, and sumatriptan. (Tr. 676-77).

At a virtual weight management visit on November 15, 2024, Ms. Barber was positive for leg swelling and myalgias. (Tr. 668).

## IV. THE ALJ'S DECISION

The ALJ first determined that Ms. Barber had not engaged in substantial gainful activity since September 21, 2023, the date of her application. (Tr. 11). The ALJ next determined that Ms. Barber had the following severe impairments: extreme obesity, depression, and anxiety. *Id*. The ALJ also determined, however, that none of Ms. Barber's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14).

The ALJ further determined that Ms. Barber had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 416.967(b), but can never climb ladders, ropes, or scaffolds; only occasionally climb ramps or stairs, kneel, or crawl; with no exposure to hazards; and only occasional changes in the work setting.

(Tr. 16).

The ALJ next determined that Ms. Barber had no past relevant work. (Tr. 21). However, the ALJ determined that, considering Ms. Barber's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Ms. Barber could perform, including work as a routing clerk, cashier, or sales attendant. *Id*. Accordingly, the ALJ determined that Ms. Barber was not disabled. (Tr. 22).

## V. LAW & ANALYSIS

### A. <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007)

(citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v.*

*Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B. Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g); *Abbott*, 905 F.2d at 923.

**C. <u>Analysis</u>**

*1. The ALJ's Step Two Analysis*

Ms. Barber first argues that the ALJ erred in determining that her headaches did not constitute a medically determinable impairment ("MDI"). At Step Two, the ALJ must determine whether the claimant has an MDI resulting from anatomical, physiological, or psychological abnormalities that can be shown by acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 416.921. The MDI "must be established by objective medical evidence from an acceptable medical source." *Id.*

The SSA has promulgated Social Security Ruling ("SSR") 19-4, 2019 WL 4169635 (Aug. 26, 2019), to explain how the agency will evaluate cases involving primary headache disorders. SSR 19-4p divides headaches into two groups: (1) primary headaches, which "occur independently and are not caused by another medical condition"; and (2) secondary headaches, which are a symptom of another medical condition. *Id.* at *3. Examples of primary headaches include migraines, tension-type headaches, and trigeminal autonomic cephalalgias. *Id.* Under SSR 19-4p, only primary headache disorders, not secondary headaches, can constitute an MDI. *Id.* at *5.

SSR 19-4 also issues guidance regarding how the agency will determine whether a claimant has an MDI of a primary headache disorder. SSR 19-4p states that "physicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms." *Id.* at *4. It further states that physicians diagnose a primary headache disorder after reviewing a person's full medical and headache history and conducting a physical and neurological examination. *Id.* Headache journals, imaging, and laboratory tests may also be of use in ruling out other medical conditions. *Id.*

Under SSR 19-4p, the SSA "will not establish the existence of an MDI based only on a diagnosis or a statement of symptoms . . . ." *Id.* at *6. Instead, SSR 19-4 lists four factors that the agency will consider in determining whether a claimant has an MDI of a primary headache disorder: (1) a primary headache disorder diagnosis from an acceptable medical source who reviewed the claimant's medical history, conducted a physical examination, and "made the diagnosis of primary headache disorder only after excluding alternative medical and psychiatric causes"; (2) an observation and detailed description of a typical headache event, including associated phenomena; (3) remarkable or unremarkable findings on laboratory tests; and (4) response to treatment. *Id.*

The ALJ expressly found at Step Two that Ms. Barber did not have an MDI of a primary headache disorder. In reaching that conclusion, the ALJ stated as follows:

> Pursuant to SSR 19-4p, the Social Security Administration may establish only a primary headache disorder, such as migraine with aura, as a medically determinable impairment when the evidence documents that an acceptable medical source (AMS) made the diagnosis of a primary headache disorder only after excluding alternative medical and psychiatric causes of the person's symptoms. Here, there is no evidence that claimant's medical providers excluded all alternative medical and psychiatric causes of claimant's symptoms to establish the diagnosis of a primary headache disorder. As such, claimant's reported headaches/migraines are not a medically determinable impairment.

(Tr. 14).

The ALJ's brief analysis is insufficient to demonstrate that the ALJ properly applied SSR 19-4p in this case. As discussed above, the ALJ was correct that the SSA will not diagnose headaches as an MDI unless an acceptable medical source has ruled out alternative medical and psychiatric causes. I and other courts have rejected arguments that an ALJ erred in finding that headaches did not constitute an MDI where an acceptable medical source failed to do so. *See Dellarco v. Comm'r of Soc. Sec. Admin.*, No. 4:22-CV-00962-PAB, 2023 WL

3324833, at *10 (N.D. Ohio Apr. 20, 2023), *report and recommendation adopted*, 2023 WL 3320142 (N.D. Ohio May 9, 2023); *Wayne P.M. v. Comm'r of Soc. Sec.*, No. 5:24-CV-01268 (ML), 2026 WL 849934, at *4-5 (N.D.N.Y. Mar. 27, 2026); *Lewis v. Soc. Sec. Admin., Comm'r*, No. 2:23-cv-00597-NAD, 2024 WL 4116356, at *9-10 (N.D. Ala. Sept. 6, 2024)

Here, however, the ALJ did not explain why he believed Ms. Barber's treating sources failed to rule out alternative medical or psychiatric causes before diagnosing her with a migraine disorder. Nor did the ALJ identify alternative medical or psychiatric causes that he believed they failed to rule out. Instead, the ALJ's analysis simply tracks the language of SSR 19-4p without providing any analysis of where Ms. Barber's treating sources fell short.

The brevity of the ALJ's analysis is concerning because the record contains treatment notes that support multiple SSR 19-4p factors. It is undisputed that Dr. Suneja diagnosed Ms. Barber with chronic migraines. (Tr. 676). Dr. Suneja further described the phenomena accompanying Ms. Barber's migraines, stating that Ms. Barber also experienced photophobia, phonophobia, and nausea. *Id*. In addition, Dr. Suneja expressly discussed failed treatment efforts, noting that Ms. Barber had tried gabapentin, topiramate, Lexapro, propranolol, verapamil, rizatriptan, and sumatriptan, but that those medications were either ineffective or caused side effects that led to their discontinuation. (Tr. 676-77). Finally, Dr. Suneja stated that medication overuse had been ruled out as a cause of Ms. Barber's headaches. (Tr. 676).

The ALJ did not discuss any of this evidence, and it is unclear whether the ALJ considered it. Indeed, the ALJ did not mention Dr. Suneja or the relevant treatment notes at all. Nor did the ALJ explain what conditions he believed Dr. Suneja or Ms. Barber's other medical sources failed to exclude before diagnosing her with a primary headache disorder. As a result, I cannot tell whether the ALJ overlooked this evidence or whether the ALJ

believed that Dr. Suneja's diagnosis and supporting explanation was insufficient to rule out other causes and, if so, why.

Nor did the ALJ provide a sufficient explanation elsewhere in the decision. When formulating the RFC, the ALJ summarized Ms. Barber's testimony regarding her migraines, including that she experiences three to four migraines per week, that they typically last two or three days, and that they are associated with vomiting and sensitivity to light, noise, and sound. (Tr. 17). However, the ALJ never analyzed that testimony and did not explain what conclusions he drew from it. The ALJ's subsequent discussion of Ms. Barber's testimony thus was not sufficient to satisfy SSR 19-4p. *See Byrd v. Comm'r of Soc. Sec.*, No. 3:22-cv-801, 2022 WL 18135581, at *6 (N.D. Ohio Dec. 22, 2022), *report and recommendation adopted*, 2023 WL 113631 (N.D. Ohio Jan. 5, 2023) (holding that ALJ's summary of claimant's testimony did not rectify failure to analyze headaches at Step Two, as "while the ALJ cited [claimant's] testimony in which [he] complained of headaches, some headache treatment notes from [his] neurologist, and [his] complaints of headaches in the record, the ALJ didn't provide any conclusions about that evidence") (citations omitted).

It should be emphasized that this is a close case. I am cognizant that the ALJ did discuss Ms. Barber's migraines and expressly held that they did not constitute an MDI because her medical sources did not rule out all other potential causes. That distinguishes this case from *Byrd*, where the ALJ wholly failed to discuss the claimant's headaches at Step Two. *Byrd*, 2022 WL 18135581, at *6. In addition, neither party has identified evidence either that Ms. Barber underwent an MRI or other imaging or that she kept a headache journal, both factors that SSR 19-4p says medical sources should consider when diagnosing a primary headache disorder. However, SSR 19-4p also specifically provides that "[w]hile imaging may

be useful in ruling out other possible causes of headache symptoms, it is not required for a primary headache disorder diagnosis." 2019 WL 4169635, at *4. Moreover, the ALJ's analysis was simply too general for me to trace his reasoning or for me to determine whether the absence of imaging or a headache journal factored into his decision. Accordingly, I conclude that the ALJ erred in his Step Two analysis because he did not explain why he believed Ms. Barber's medical sources failed to exclude other potential causes of her headaches and because it is unclear whether he considered the relevant evidence.

The Commissioner argues that, even assuming the ALJ erred at Step Two, any error was harmless because the ALJ considered Ms. Barber's testimony regarding her headaches when formulating her RFC, and because the RFC was consistent with the opinions of the state agency medical consultants. Neither argument is persuasive. As discussed above, while the ALJ summarized Ms. Barber's testimony regarding her headaches, he did not analyze it and did not explain how—if at all—he factored her headaches into the RFC. Moreover, while the ALJ's RFC may have been consistent with the opinions of the state agency medical consultants, he did not rely on their failure to identify Ms. Barber's headaches as a severe impairment when formulating the RFC. The ALJ's Step Two error was not harmless, and I recommend that the Court reverse the Commissioner's final decision so that the ALJ can properly apply SSR 19-4p and determine whether Ms. Barber's headaches constitute an MDI.

### *2. The ALJ's Formulation of Ms. Barber's RFC*

In her second assignment of error, Ms. Barber argues that the ALJ erred in formulating her RFC because the ALJ failed to include a limitation that Ms. Barber would need to elevate her legs. Ms. Barber also argues that the ALJ's alleged error is not harmless because the VE testified that a leg elevation limitation would be work preclusive.

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17 (quotations omitted).

Here, the ALJ considered Ms. Barber's testimony regarding her need to elevate her legs, but held that additional limitations were not warranted:

> Regarding claimant's allegations of leg swelling, at appointments in July, August, and October 2023, and April 2024, claimant denied symptoms of leg swelling. (Exhibits B3F/29, 77; B4F/13; B8F/14). Additionally, at multiple appointments claimant's providers observed that claimant had no extremity edema. (Exhibits B3F/24, 106; B8F/18; B8F/10).

(Tr. 18).

Elsewhere in the decision, the ALJ discussed Ms. Barber's spinal condition and left knee osteoarthritis, noting that she had imaging results demonstrating ongoing issues but that she displayed no swelling, erythema, effusion, warmth, deformity, problems with sensation, or gait problems at multiple appointments. (Tr. 13).

Ms. Barber argues that substantial evidence does not support the ALJ's conclusion because other evidence in the record shows that she experienced leg swelling and numbness. She accuses the ALJ of relying on out-of-date reports to her doctors while ignoring evidence that she complained of numbness and swelling at several appointments and was positive for

leg swelling during some examinations.

However, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision"). Substantial evidence supports the ALJ's conclusion not to include a leg elevation restriction in light of medical records showing that Ms. Barber presented without leg swelling and denied such swelling as late as April 2024. I may not second-guess the ALJ's decision simply because Ms. Barber cites other evidence in the record that could have supported a more restrictive RFC. Ms. Barber's second assignment of error is without merit.

## VI. RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the Commissioner's final decision and REMAND this matter to the Commissioner for further proceedings consistent with this report and recommendation.

Dated: October 16, 2026

*<u>/s Jennifer Dowdell Armstrong</u>*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII. NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed**

> **findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.** Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).